Four arguments today, and the first one is number 15-1489, Paperfabrik August Koehler v. U.S., Mr. Wood. May it please the court, I'm John Wood on behalf of the appellant Koehler SE. I'd like to say three minutes of my time for rebuttal. In this case, Commerce imposed a 75.36% total AFA rate. That's more than 11 times the highest rate ever calculated for Koehler. This equates to over $100 million in duties for this period of review alone, and that's on top of a comparable amount for period of review 2 as well. Now, Commerce purported to corroborate this AFA rate based on a single stray transaction, one transaction from period of review 2 that had a reported margin of 144%. So to put this one transaction in perspective, we look – yes, you're on. Am I remembering right? That wasn't sort of the only basis of corroboration. Commerce also looked at other numbers that, while smaller than the number it chose, was, you might say, somewhere in that range. I actually don't believe so. I don't even remember what's still confidential here. So none of that is confidential. So there were numbers in the 50% range? There was – and actually, I'd direct your attention to page 34 of our opening brief, and there's a graph here, which is also at JA 1862. There was also one transaction between 40% and 50%. So you can see the 144 is barely discernible there all the way over in the bottom right-hand corner. There's one other transaction of 40% to 50%. Now, that, of course, is well below the 75.36%. After that, you have to go to 20% to 30% to find – So are you saying that, as a matter of law, Commerce was barred from relying on that sales data, that 144%? I'm saying that the corroboration or purported corroboration was not supported by substantial evidence because it relied – My reading of what Commerce did is that it relied entirely on the 144%. What about cases like Ta-Cheng and Pam that also pointed to very tiny volume of sales data as evidence to justify the rate? Right, Your Honor. And so both Ta-Cheng and Pam, I believe, were distinguished in – And I will find the case here. Actually, it's this court's decision in Gallin-Ocean pointed out that Ta-Cheng had made a sale of 30.95% dumping margin during the relevant period of review. But that case relied on primary information, thus it didn't – And that's something this court pointed out in Gallin-Ocean. Now, Pam – in Pam, there were actually 29 transactions that had margins at or above the 45.49% AFA rate. So neither of those cases would seem to – What about Nian-Ya? Pardon me? Nian-Ya, which relied on one single margin rate that was the highest margin rate. Yeah, Nian-Ya was not a corroboration case at all. In fact, I think there was a lengthy section there in this court's decision explaining that because it was primary information, corroboration was not needed at all. So there was nothing about Nian-Ya that could affect this court's prior decisions in cases such as – Is the 144% sales data primary information or secondary in this case? Well, the 144 in this case would count as secondary information. But in any event, it's the 75.36% that has to be corroborated, and it's 75.36% AFA rate. That, in my opinion, is undisputed in this case that that counts as secondary information because it was taken from the petition. And so going back to Judge Sewell's question about Nian-Ya, there's nothing about Nian-Ya that in any way calls into question this court's decisions in cases such as the Chaco and Gallin Ocean where it's well established in the corroboration context that an AFA rate has to be a reasonably accurate estimate of the respondent's actual rate, albeit with some built-in increase or deterrent. Now, again, if I draw your attention to page 34 of our opening brief where we have this graph, there's nothing about this graph that can even remotely suggest that a 75.36% AFA rate is in any way relevant or reliable, which is the test for corroboration. So there's a 144% stray transaction that on its face is obviously aberrational for several reasons. One is it's a single sale, minuscule volume. I understand it's the equivalent of one roll of lightweight thermal paper. Now, we're not saying that either of those by themselves is determinative. It's not just that it's one sale. It's not just that it's a tiny volume, but it's those facts. Plus, it's so egregiously out of line with all of the other margins. As I said earlier, the next closest you can find is 40% to 50%, and that also is only one transaction. And that was well below the 75.36% petition rate that was relied on for adverse facts available here. And so I'd point out that if you look at this graph on page 34, this reflects a guess. Can you remind me what, if any, was the asserted basis in the petition for the 75% rate? So it used a combination of data from another company, Mitsubishi, and used some of Kohler's data, but very little. So Kohler's actual data played a very small role in calculating the petition rate. And as you know, the petition rate is something supplied by the petitioner. So it is, in some ways, the least trustworthy of any of the data here, and therefore subject to the highest corroboration. It is something that the statute allows commerce to look at, but it is unquestionably secondary information, and therefore has to be corroborated. And the reason is obvious, because this is not something that was calculated by commerce for a previous period of review. In the previous periods of review, the highest ever calculated for Kohler was the 6.5% from the original investigation. But even that rate was never actually used, because the rates were always lower for all the other periods of review. In period review one, there was a single-digit number, which was then overturned by the CIT, and on remand, commerce determined that the amount after properly taking into account the rebates was de minimis. So it's effectively zero. So there's nothing remotely close to corroborating the 75.36%. As I said earlier, there's over 11 times the 6.5% that was calculated in the original investigation. So there's no evidence from any period of review that can even remotely corroborate the 75.36%. And to the contrary, all the evidence from the previous reviews undermines the relevance of the liability of the 75.36%. And even the data from period review two, which is what commerce relied on, that data strongly suggests that the 75.36% can't be corroborated with substantial evidence. What do you think, specifically, commerce should have done in corroborating or finding a corroborated rate to apply? It should have considered all of the data. And so I think that's one of the lessons from Gallant Ocean. If I remember right, the government's fundamental response on that is, we are entitled to ignore all of the rest of your data because you lied to us about some of it, so we can't trust any of it. Am I getting their position right? I think you're getting their position right. It's hard to actually take that with a straight face because it doesn't mean that they can just make it up. And that's all that they did here. So the commerce department decided because Kohler submitted information that had omitted home market sales, that we don't have to trust anything that they're saying, and we can just speculate on what it might be. So commerce even goes so far, I believe, to say that in this graph here on page 34, reflecting the period of review data, that this seems their reliance on this is somehow conservative because they speculate there could be higher market transactions. Isn't a version of their theory that this graph is meaningless? Because we have no idea. We basically will not accept the figures all on the left side of the graph. As far as we are concerned, we're going to assume you made those up too. I think that's an accurate description of what commerce said, and I think that that cannot be supported. There's no substantial evidence then. If they're just at that point saying we're not going to believe anything you say, we're going to just make it up, then there's no substantial evidence. Now, I'd also point out that just as a factual matter, there's no basis for saying that they can speculate that there would be higher margin transactions if nothing had been omitted because all that was omitted was the only evidence on the record  The home market sales are used to calculate a monthly average, which is then compared to individual U.S. sales. So this chart reflects margins for U.S. sales as compared to an average home market sale by month. So there are no sales that are actually missing from this chart. Now, these numbers, if you were to include the omitted home market sales, might vary slightly because— I'm sorry. This chart is of home market sales or of U.S. sales? This is margins, and so it's individual U.S. sales compared to a monthly average for the relevant month. And so the only thing that was missing here were home market sales. And so the U.S. sales, the individual U.S. sales here are compared to average monthly home market sales. And so there's no evidence whatsoever that any U.S. sales are missing. And so all of the sales transactions are reflected here, but the numbers vary slightly. I guess Commerce's theory is that since this chart is in part based on home market sales and compare them to the U.S. sales, we simply will not trust anything you have told us about your home market sales. We just erase that, and so the chart is meaningless because you only get to these bars by subtracting one from the other. But if it's meaningless, then this data can't be relied upon at all to corroborate it. They can't have it both ways. They can't say we're going to throw all the data out, yet we're going to pick a number and say it's corroborated. They still need substantial evidence to corroborate it. Except that the adverse inference provision allows them to hold things against you. That's correct. So as cases such as Gallin-Ocean and DiCicco have said, Commerce is permitted to come up with a reasonable estimate of what the actual margin would be, albeit with some built-in increase as a measure of deterrence. That doesn't mean that they can simply throw everything out the window, and that's exactly what they did here. If you throw out all this data, there's nothing that Commerce can rely on to corroborate the rate that they used, and they have to have substantial evidence to justify the corroboration. Otherwise, this court can't uphold it. Do you want to save your time? Yes, Your Honor. Okay, thank you. You, Mr. Perlund? Yes, Your Honor. Please. Good morning, Your Honor, and may it please the court. To address the corroboration issue first, fundamentally it's worth starting at the point that the anti-dumping statute itself, it's section 1677E, explicitly authorizes Commerce to use the petition rate that it used in this case. If corroborated. If it's corroborated, but it also makes a provision to the extent practicable. And it's also important to note, and Commerce was very clear about this in its issue and decision memo, that it did not rely on a single sale, but among limited sources for corroboration, which matches up with the statute's clause about doing things to the extent practicable, Commerce looked at what Kohler reported as its own commercial practices in the previous review and looked to a range of transactions. And the petition rate that Commerce ultimately used was not at the 144% that was at the top of that range, but was significantly closer to the other high margin transactions that were at the bottom of that range. The precise number, because I think it's been disclosed publicly now, there was a 49% transaction, there was a 29% transaction, and I think a total of 18 in that 20 to 30 range, as well as hundreds in at least double digits, the 10 to 20% range. So Commerce, at the end of the day, looked to permissible sources of information and looked to what Kohler was saying. I think the point is slightly more subtle than the way in which Your Honor articulated it. I think Commerce does fundamentally distrust the information that Kohler – it's tainted by the transshipment scheme, but at the same time, this is applying the adverse inference provision. The information that Kohler at least represented were its commercial practices in the second review, and that's what makes it permissible for Commerce to use that information for the limited purpose. Let me, I guess, test that a little bit. I'm not sure that if you give no more than some taint view to this chart, which is, I gather, subject to simply disbelieving it is – or let's consider you think it's only tainted maybe a little bit. Then if you take it substantially seriously, how could this rate, which is – be considered relevant and reliable? How could the numbers – So I understand Your Honor's question. I understand how you get there if you say we just got to ignore it basically or treat it with – because we don't trust anything, we will merely use it against them. But if you think like DiCecco, we're going to adjust it a little bit, we're going to question it. But if you take it at all seriously, isn't this just way off? So that's the question I was getting at, and my point is that one doesn't have to throw out this chart entirely to determine that the AFA rate here of 75% was adequately corroborated. And that goes to this court's decision in KYD, which made very clear that in applying an AFA rate, Commerce does not have to apply what would be a typical dumping margin for the industry in question or a typical dumping margin for a cooperating respondent. Or – and this bleeds into this court's decision in Nanyang – something that reflects what the rate would have been if the respondent had otherwise cooperated. But why doesn't it need to be kind of close to what the rate would have been? Sure. Well, because – I realize kind of close is not much of a standard, but whatever that is, this is probably not that. Well, respectfully, Your Honor, this is within the range of the – what Kohler reported as the highest margin sales that it completed in the second review. So this is consistent with Kohler's commercial practices, and although there are some sales that are somewhat lower than the AFA rate, which again is much closer to that number – the AFA rate is not 144% – even though Appion had specifically urged Commerce to potentially rely on that number, Commerce went with the 75% number, which is much closer to the other transactions that Kohler reported. Right, but it's still 50% higher than kind of the relatively small group at the north end of all of the rest of the settings. Well, but that's precisely what this court addressed in KYD and, for example, in Ad Hoc Shrimp. I mean, it's ironic that these cases were both at court at the same time, but Ad Hoc Shrimp was arguing that the rate was, you know, with emphasis, 12 times higher than the rate that had been applied to Ad Hoc Shrimp – I'm sorry, Hilltop, the respondent in that case in previous reviews. And Kohler here – and the court obviously upheld that AFA rate. In KYD, the court has upheld rates that were significantly higher. In KYD, it's an astronomical number, dozens of times, and I think when you take the average of those, it's like over 100 times higher than the rate. So the court has upheld rates that are based on relatively small amounts of information and are significantly higher than the typical rate under the adverse facts available. After all, DeChecko says it's supposed to be – Close plus some deterrence. Plus some deterrence. So here you have transactions that are high but somewhat lower than AFA rate. And that also brings us to another point, which is this court's decision-making, for example, in Gallant Ocean. The way in which Gallant Ocean distinguished Ta-Cheng and Pam is precisely why this case is more like Ta-Cheng and Pam than it is like Gallant Ocean. I mean, first of all, Gallant Ocean didn't involve the type of intentional misconduct. I mean, the party there was kind of an unsophisticated party that had never participated in the review. Do you think that what constitutes corroboration depends on the reason you get to the adverse inference standard in the first place, whether it's intentional or merely negligent failure to cooperate? I think it provides a framework, and particularly when you're talking about a rate that is intended to deter noncooperation. I'm not sure that's the central issue, but I think it's an important framework for what was going on in Gallant Ocean. But the important distinction is that this court in Gallant Ocean said, look, this rate has nothing to do with Gallant Ocean. They've never participated. There's nothing tying this rate to Gallant Ocean. Unlike Ta-Cheng and Pam, where we allowed Commerce to rely on a small amount of information precisely because that information had been tied to the commercial practices of the companies in question. Ta-Cheng was a single sale, but it was a single sale by that company. And in the same way here, again, Commerce was very clear that there are limited information sources. The statute said to the extent practicable, and Kohler is the only respondent in the history of this proceeding. And obviously its data had also been affected by the actual scheme itself. And so among those limited sources, Commerce used a petition rate that it's statutorily authorized to use and then went to Kohler's own data that Appion had put on the record and said, this matches what Kohler has reported as its own commercial practices. The one more issue that I want to make sure I address is the way that Kohler attempted to distinguish the Nanyang case. The Nanyang case may have been a case that involved so-called primary information, but it speaks for itself. Nanyang pursued a broad discussion of Commerce's responsibilities in the realm of applying adverse taxability. How does commercial reality – I mean, Nanyang talks about commercial reality in the context of the actual margin. How does that compare to corroboration? Maybe that's where you were going. It is where I was going, Your Honor. What Nanyang said is that commercial reality doesn't appear anywhere in the statute. And so Nanyang looked back to the statements about commercial reality and accuracy that are in – The Checo, it said. The Checo, and said, look, don't take these too far. This is not a statutory term. This is a guidepost. Commerce, if it complies with the statutory requirement of corroborating to the extent practicable, is within its permissible actions under the statute. And that's all that commercial reality means. And here, these transactions were all what Commerce calculated based on Kohler's reporting. Do you disagree with the interpretation of corroboration as requiring that the information, the result be relevant and reliable? No. That's the standard Commerce applies. So relevant to what and reliable for what purpose? Well, relevant to Kohler because these are Kohler's own reported transactions. And reliable for what? Reliability has to do with – it's a reliable basis for drawing a particular kind of inference. What's the inference if it's not something like commercial reality? I think the idea is that it's reliable information. I mean the statute gives Commerce very broad discretion when it's looking for corroboration sources, and presumably there could be more exotic sources than looking at a company's own data. So if you were – I mean, for example, the ad hoc shrimp data was from a WTO implementation proceeding, so on and so forth. And I think there's – at some level you want to make sure it's reliable. Here it's reliable because it's – what's Kohler saying is these are our transactions. This is what we're reporting. This is what – despite the fact that there were obviously sales that were omitted that were not reported. This is what Kohler wanted to put forth as its face to Commerce. This is the dumping we were doing. And so Commerce looked at that and said the petition rate that we're authorized to use is consistent with the high end of what you're reporting as your dump transactions in the second review. And that's – in this limited information world we're in, that's an adequate basis for us to determine that this petition rate is probative and has some bearing and some relationship to Kohler. I see that I'm running low on time, and I actually want to leave some for my colleagues. Okay, thank you, Mr. Koehler. Thank you, Your Honor. Mr. Schneiderman. Please, the court. I'd like to address your questions. First, I'd like to point out that margin is not necessarily considered aberrational just because it's a statistical outlier. Putting aside the fact that Kohler didn't report the transactions that would have resulted in the highest margins, the fact that there is a sale of 144%, even if it's much higher than the next highest, doesn't – Are we arguing about the word aberrational? I'm not sure what aberrational means if it doesn't mean this is unique. The Avisma case and the Nanya case says that just be – sometimes you have a sale that's just dumped at a much higher rate. It doesn't – when we talk about aberrational, we mean that there's something unusual about that particular transaction. I think we're just talking about words, but it doesn't – anyway. Well, the sale itself – It seems to me it's aberrational if there's nothing else like it, even if it's a real transaction. The margin is certainly much higher than the next highest, but that in itself, according to the precedent, shouldn't render it unusable for purposes of the corroboration analysis in the Avisma case and the Nanya case. And also going to your question about should we look at the nature of the misconduct here as part of the corroboration analysis? And I'd like to speak to that because we have to remember here that this is a fraud case. This is a case where Koehler intentionally set out to conceal its sales and, as Commerce found, submitted a fraudulent questionnaire response. And that is relevant to the corroboration analysis because, as you mentioned, in the DiCicco case, the court said, look, you look to Koehler's actual rate plus an additional amount for deterrence. Well, how do you set that additional amount? I think it has to be reasonably calibrated to the nature of this conduct that occurred. In most of these AFA cases, you have respondents that either make a mistake or perhaps they don't understand the reporting obligations, and that conduct can only be deterred so much. But when you have a respondent like Koehler that sets out from the very beginning to conceal sales and commit fraud, I think that even if they believe that the chances of getting caught or being detected are fairly low— Did Commerce rely on that rationale? I don't remember. Did Commerce say that one reason that we are choosing this rate, which is pretty darn far from anything else except the one—what's the word—unusual sale, is because that's what we think is necessary to deter this particularly bad kind of conduct? Absolutely, Your Honor. Where's that? At pages 1950 to 1951 in the Joint Appendix, which is towards the end of the final determination, Commerce precisely found that the petition rate of 75% is the rate that's required to deter the particular misconduct that occurred in this case. And it also found that the alternative rates that had been proposed by Koehler—all of which, by the way, were in the single digits—would be insufficient. In fact, would have no deterrent effect. And Judge Soukalos made a finding towards the end of page 17 of his slip opinion where he said that this is the rate that's required to deter the misconduct, given the extreme nature of the fraud that occurred here, and it's perfectly consistent with the DiCecca case. And actually, if you read the decision by Judge Stancu in the second review, he affirmed precisely on that basis. Am I allowed to read that one? Allowed to read that case? Yeah. The slip opinion has been placed on the record in a 20HA decision—a letter. And Judge Stancu actually found that the rate is corroborated solely on that basis, even though he did not consider the one sale with a 144% rate, although I should point out that the records of the two cases are different in that respect. And so Judge Stancu's reasoning for disregarding that rate really don't apply here.  Time is up. Thank you. Thank you, Your Honor. Three minutes. There are several things I'd just like to point out. I guess I'd like to start out by saying that Appian describes Kohler's conduct here as having set out to conceal sales and commit fraud, and I would just point out that there is no substantial evidence to support that. The only evidence on the record here is that certain employees, in an attempt to contravene Kohler's own— We certainly have to accept that there were agents of the company that did this in part for the purpose of changing the home market sale. That piece, actually, there is no record evidence to support. There's no record evidence of that? The admission by Kohler is only that there were employees who made sales through a third country in contravention of Kohler's anti-dumping protocol. Senior personnel were involved. No, no. Again, that's one quote that's been taken way out of context, which is that was in the context of Kohler explaining that it took personnel action against the senior people involved. And I would submit that that means the senior most of the people involved as opposed to the people in the shipping department who prepared labels and things like that. But if there's a dispute as to that, that's an issue where—that points out exactly why Commerce should have allowed Kohler an opportunity to present its side of the case, but it never gave it a chance to do so. But I'd also like to point out an important legal issue here, which is that the government said that NANYA speaks broadly. And I really want to emphasize that NANYA did not purport to nor could it overturn this court's decisions in cases such as the Chaco and Gallin Ocean. So the standard in the corroboration context is unchanged by NANYA. Now, I'd also like to point out when I was asked earlier by the court whether or not Commerce looked to anything other than that 144% transaction. And Commerce's language actually was that it was relying on a range of margins in which the 75.36% fell. But as you can see from that chart, absent the 144%, there's no range in which the 75.36% even remotely fell. So to answer your question, I do think that it was really—Commerce was really relying on that 144% transaction because otherwise you don't have— But there's also the 48-point-something percent, right? Correct, but that doesn't create a range in which the 75.36% falls. So the range consists of the 144% and then something which was below the— But not extraordinarily below. Significantly below, I would say. Not multiples. Pardon me? Not multiples below. I mean— Not multiples low, but I don't think we have to show that the AFA rate was multiples of something that wasn't even the one that Commerce was relying on. So, I mean, I think that the 144 is clearly aberrational. As I said earlier, you get into—I think it was the one transaction from 40-50, and to get anything more substantial, there are 18 between 20 and 30. So, again, 75.36 is nowhere near that. But I'd also point out that when it comes to the question about what Commerce had to do to corroborate, Commerce— It still had an obligation to corroborate, and it could have done so under the statute and under independent sources that are reasonably at its disposal. So it could have looked at data from the original investigation. It could have looked at period of review one, which was not in any way affected by this transshipment because that started later. So it had plenty of data it could have looked at, even if it said, incorrectly in our view, it was going to disregard all of the data from period of review two other than that 144% transaction that it relied on. You need to finish up. Okay. That doesn't mean the whole minute. I mean, like two sentences. Okay. So, in conclusion, I would point out that the 144% transaction is, whether you call it unusual or aberrational, I would call it unusually aberrational. It is an extreme outlier that can't reasonably constitute any kind of substantial evidence to support the 75.36% of the margin here, which had an incredibly punitive effect of $100 million in duties against my client. Thank you, Your Honors. Thank you. Case is submitted. Thank you.